UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 5: 20-102-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| MARQUIS ANTONIO TOMPKINS, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

*** *** *** ***

Defendant Marquis Antonio Tompkins has filed a motion to suppress out-of-court identifications obtained via a photographic lineup. [Record No. 39] He argues that admission of identifications from photographic lineups occurring in August 2020 and September 2020 would constitute a due process violation. [Record No. 40] The United States has responded, [Record No. 44], and testimony from two law enforcement officers was offered during an evidentiary hearing held December 21, 2020. [Record No. 45] Because Tompkins has not met his burden to demonstrate a due process violation, His motion to supprss will be denied.

I. **FACTUAL BACKGROUND**

Tompkins challenges out-of-court identifications made by two witnesses, both confidential informants. Both informants[1] assisted the Kentucky State Police and federal law enforcement with the investigation into Tompkins's alleged crimes. According to testimony,

---

[1] During the evidentiary hearing, the witnesses were identified by the numbers 118 and 119, along with 1 and 2. For consistency, Confidential Informant 119 will be referred to as Witness 1, and Confidential Informant 118 will be referred to as Witness 2.

each informant was paid approximately $100.00 per transaction and had prior criminal history, but they were not under the influence of any controlled substance or alcohol when working with law enforcement. During the evidentiary hearing, the Court received testimony from Detective Calin Purdue of the Mt. Sterling Police Department and Detective Brad Watson of the Kentucky State Police, both a part of the Gateway Area Drug Task Force. [Record No. 46]

### A. Witness 1

According to the affidavit of Special Agent Russel King of the Bureau of Alcohol, Tobacco, Firearms and Explosives, Witness 1 met "a subject known to him as 'LA', who introduced him to another black male subject known only as 'Q'." [Record No. 1-1, ¶ 6] At that point, law enforcement "utilized [Witness 1] to conduct a controlled purchase of a quantity of suspected heroin for $300 from 'Q'." [*Id.* at ¶ 7] Witness 1 later "relayed that 'Q' is a well-built black male, bald, approximately 6' tall with gold teeth." [*Id.* at ¶ 8] According to Detective Purdue, law enforcement did not identify "Q" during the first transactions, but were able to determine that a white Chevrolet SUV operated by "Q" belong to a Taurean Tompkins (hereafter, "T. Tompkins"), the brother of the defendant.

With this information, Detective Purdue met Witness 1 on February 26, 2020, to show him two photographic lineups. Detective Purdue created the first lineup (hereafter, "Exhibit 1") by downloading a photo of T. Tompkins from social media and performing a Google image search using that photo. It contained six color photographs, including one of T. Tompkins. Detective Purdue did not know the identity of any other individual included in the photographs. When presented with the first lineup, Witness 1 pointed to T. Tompkins and stated that he could be "Q," but he was not sure.

After showing Exhibit 1 to Witness 1, Detective Purdue showed him a second lineup. The second lineup (hereafter, "Exhibit 2") was created using the same Google image search method. It also contained six color photos, including one of Tompkins. As with Exhibit 1, Detective Purdue was not aware of the identity of any other individual. Detective Purdue testified that as soon as he placed the lineup in front of Witness 1, he looked and pointed at Tompkins. Witness 1 claimed to be 100 percent sure of his identification. Before making this identification, Witness 1 had met Tompkins three times: once at an initial meeting and twice for controlled purchases. All three meetings lasted no more than a few minutes.

Detective Purdue testified that he did not give Witness 1 any specific instructions and did not point to any pictures when he presented him with the first two lineups. Rather, he only asked him if he recognized anyone in the lineups. Witness 1 had no questions for Detective Purdue, and Detective Purdue testified that he had no concerns about Exhibits 1 and 2.

Three additional photographic lineups (hereafter, "Exhibit 6," "Exhibit 7," and "Exhibit 8") were also shown to Witness 1 to confirm the original identification after Tompkins commented that T. Tompkins was actually "Q." According to testimony from Detective Watson, these photographic lineups were created by the Kentucky State Police's intelligence branch at his request. Detective Watson testified that he reached out to the intelligence branch *via* email, submitting Tompkins's name, date of birth, and Social Security number. He also submitted T. Tompkins's information. In return, he received a packet including several photographic lineups and individual photographs and information about the individuals featured in the lineups.

Exhibits 6, 7, and 8 each feature six black-and-white photographs. Exhibit 6 includes one photograph of T. Tompkins. In Exhibit 7, both Tompkins and T. Tompkins are pictured. And in Exhibit 8, just Tompkins is included among the 6 photographs. Detectives Watson and Purdue presented all three lineups, one at a time, to Witness 1 on August 13, 2020. He did not make an identification when presented with Exhibit 6, but immediately identified Tompkins when presented with Exhibits 7 and 8. According to Detective Watson, he was adamant and confident in his identifications.

During cross-examination, Detectives Purdue and Watson testified that they were aware that Witness 1 had described Tompkins as having gold teeth, but that he did not offer any further details about the gold teeth. Examining the exhibits, Detective Purdue acknowledged that the shine on Tompkins's face and teeth, which could be gold teeth, was missing from the other individuals included in the lineup. He testified that he did not personally see gold teeth on any individual featured in the photographic lineup. Detective Watson testified that it was possible to see the gold teeth in the black-and-white photos and that no other individuals in the lineups show gold teeth.

### B. Witness 2

Witness 2 first contacted Detective Purdue regarding the Tompkins investigation in August 2020, after working with him on a separate case in early 2020. He claimed to have information regarding an individual who had sold controlled substances to him. During the Tompkins investigation, Witness 2 did not make any controlled purchases. He was also never shown Exhibits 1 and 2.

However, on September 17, 2020, Witness 2 was shown three photographic lineups (hereafter, "Exhibits 3, 4, and 5") to identify an individual he had allegedly made purchases from. These lineups were received by Detective Watson using the same Kentucky State Police process described above.[2] Like the other lineups received by Detective Watson, each contained six black-and-white photographs. Exhibit 3 includes a photo of Tompkins, Exhibit 4 includes a photo of T. Tompkins, and Exhibit 5 features both Tompkins and T. Tompkins.

One by one, Detective Purdue showed Witness 2 each photographic lineup. He did not give Witness 2 any specific instructions or mark on any lineup before the identification was made. When shown Exhibit 3, Witness 2 immediately pointed to Tompkins and identified him as "Mr. Good Stuff." Detective Purdue testified that Witness 2 recognized Tompkins because he had purchased controlled substances from him. When shown Exhibit 4, which included only T. Tompkins, Witness 2 made no identification. And when Exhibit 5 was shown to him, he immediately identified Tompkins.

## II. LEGAL STANDARD

The admission of an out-of-court identification violates the due process clause only when the identification procedures are so unnecessarily suggestive that they create the risk of irreparable misidentification. *See Perry v. New Hampshire*, 565 U.S. 228, 238–40 (2012). In making this determination, Sixth Circuit caselaw requires a two-step inquiry. *Haliym v. Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (citing *Howard v. Bouchard*, 405 F.3d 459, 469

---

[2] These lineups are identical to the ones shown to Witness 1, but they were presented to Witness 2 in a different order. Exhibit 3 is identical to Exhibit 8, Exhibit 4 is identical to Exhibit 6, and Exhibit 5 is identical to Exhibit 7. Accordingly, Tompkins's arguments apply to both identifications.

(6th Cir. 2005)). First, "the defendant must show that the identification procedure was unduly suggestive." *United States v. Sullivan*, 431 F.3d 976, 985 (2005). If the defendant does not carry this burden, admission of the out-of-court identification is not a due process violation. *See Perry*, 565 U.S. at 248. If it was, the Court then must "consider whether the evidence was nevertheless reliable despite the impermissible suggestiveness of the identification procedure." *Haliym*, 492 F.3d at 704 (citing *Howard*, 405 F.3d at 469).

A photographic lineup may be unduly suggestive "where the conduct of the police directs the attention of the witness to the suspect." *United States v. Fields*, No. 3: 11-CR-45-H, 2012 U.S. Dist. LEXIS 57246, at *15 (W.D. Ky. Jan. 25, 2012) (citing *Howard*, 405 F.3d at 469–70). A law enforcement officer's intent "to prejudice the defendant" is not relevant to this determination. *Howard*, 405 F.3d at 470 (citing *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986)) Rather, this analysis "questions whether the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection." *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001) (citing *United States v. Russell*, 532 F.2d 1063, 1068 (6th Cir. 1976)). At step one, "the primary evil to be avoided is a very substantial likelihood of irreparable misidentification.'" *Howard*, 405 F.3d at 470 (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

If the photographic lineups are deemed unduly suggestive, the Court must then determine reliability. To determine whether the identification was "independently reliable," the Court "consider[s] the totality of the circumstances, including the following factors: (1) the opportunity of the witness to view the defendant at the initial observation; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the defendant; (4) the

level of certainty shown by the witness at the pretrial identification; and (5) the length of time between the initial observation and the identification." *Howard*, 405 F.3d at 482 (citations omitted). The Court "weigh[s] these factors against any 'corrupting effect of the suggestive identification.'" *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

### III.  ANALYSIS

**A.  Step One: Was the Lineup Unduly Suggestive?**

Tompkins argues that the photographic lineups were unduly suggestive for two reasons. First, he argues that presenting a witness with a six-photo lineup featuring Tompkins, followed by a second six-photo lineup featuring five new photographs and an identical photograph of Tompkins,[3] renders the photographic lineups unduly suggestive. [Record No. 40, p. 2] Second, he argues that photographic lineups[4] featuring Tompkins as the only individual with visible gold teeth are also unduly suggestive. [*Id.* at p. 3] Tompkins does not offer caselaw to support his conclusion that these facts render the photographic lineup unduly suggestive, but the Court will address each argument in turn.

Tompkins first argues that two photographic lineups presented to Witness 1 were unduly suggestive because both featured Tompkins, but the other five individuals included were different in each lineup. According to Tompkins, "[t]he fact that no other members in the line-up were presented again or that a different photograph was not used means that the

---

[3]   Based on the government's exhibits, Tompkins appears to be referring to Exhibits 7 and 8, which were shown to Witness 1. Both photographic lineups contain Tompkins and five unique individuals.

[4]   Tompkins takes issue with Exhibit(s) 3, 5, 7, and 8. Exhibits 3 and 5 were shown to Witness 2 and Exhibits 7 and 8 were shown to Witness 1.

informant was simply presented with the exact same picture twice, which would clearly trigger suggestiveness in the mind of someone who is looking closely for familiarity amongst individuals presented to them." [Record No. 40, pp. 2–3]

Tompkins does not state which confidential informant was subject to this procedure. However, the only procedure that fits this description was the August 13, 2020, meeting with Witness 1. After being shown Exhibit 6, which included only T. Tompkins, Witness 1 was shown Exhibits 7 and 8, which both contained Tompkins and five other individuals. Both Detectives Purdue and Watson testified that they were confident at that point that Tompkins had been accurately identified by Witness 1. Up to that point, Witness 1 had identified Tompkins after viewing two photographic lineups, which Tompkins has not challenged. Detective Watson clarified that the August identification procedure was primarily used to rule out T. Tompkins, who Tompkins had suggested was responsible for the controlled transactions.

Given this factual background, there is no basis to conclude that showing Witness 1 Exhibits 7 and 8 was unduly suggestive. Witness 1 was shown two photographic lineups on February 26, 2020, and immediately identified Tompkins in one lineup. Seeking to confirm the identification of Tompkins, and rule out T. Tompkins, law enforcement conducted a second procedure with photographic lineups strategically created to include both Tompkins and T. Tompkins. Witness 1 again identified only Tompkins.

Another district court in this circuit found that "confirming [a witness's] choice" does not make an identification procedure unduly suggestive. *See Brantley v. Harry*, No. 2: 17-cv-13634, 2019 U.S. Dist. LEXIS 87496, at *13–18 (E.D. Mich. May 24, 2016). In *Brantley*, the witness identified the defendant in a black-and-white photographic lineup, confirmed his

identification in a single, color photograph, and confirmed his identification again in a color photographic lineup. *Id.* at \*14–15. Because the identification was successfully made in an "initial, non-suggestive array . . . [which] had no apparent irregularities," the procedure was not unduly suggestive. *Id.* at \*15. Here, Witness 1 had accurately identified Tompkins twice (in Exhibit 2 and Exhibit 7) before being shown an identical photo of Tompkins surrounded by five different individuals. This procedure was not unduly suggestive.

Tompkins also suggests that the photographic lineups which display his gold teeth are also unduly suggestive. [Record No. 40, p. 3] Both Detectives Purdue and Watson testified that Witness 1 described Tompkins as having gold teeth prior to the February identification procedures. However, both also acknowledged that on the black-and-white photographs presented to the witnesses, it was not clear that Tompkins had gold teeth in the included photograph. And whether one could see the gold teeth in the photograph, both agreed that Tompkins was the only individual featured that displayed the shine of gold teeth.

The depiction of Tompkins as the only individual with gold teeth does not, on its own, render the photographic lineup unduly suggestive, even where Witness 1 described Tompkins as having gold teeth. *See Legenzoff v. Steckel*, 564 F. App'x 136, 144 (6th Cir. 2014) (collecting cases) ("Many cases . . . indicate that a photo array is not suggestive where only the defendant is dressed in clothing or has a personal attribute that is expressly referenced by a witness."). An Eleventh Circuit opinion—*United States v. Perkins*, 787 F.3d 1329, 1343–45 (11th Cir. 2015)—directly addresses this issue. There, a witness was presented a photo array containing six photos. *Id.* at 1344. Each man photographed looked roughly similar, but the defendant was the only man with gold teeth. *Id.* The witness testified that when shown the

array, "the officer simply asked if he recognized anyone on the page" and "did not indicate that the manager should choose a particular photo." *Id.* The Eleventh Circuit held that it was not clear error to conclude "that this fact [Perkins being the only man with gold teeth] alone did not make the lineup unduly suggestive."[5] *Id.*

The undersigned agrees that the depiction of gold teeth alone does not render a photographic lineup unduly suggestive. This is especially true here, where the image quality causes difficulty recognizing the presence of gold teeth at all. Additionally, Witness 1—the only confidential informant who described Tompkins as having gold teeth to law enforcement—accurately identified Tompkins six months prior to the identification procedure in question when presented with a photographic lineup that did not show Tompkins with gold teeth. In short, Tompkins has not presented any evidence to suggest that law enforcement "steered [Witness 1 or 2] to one suspect or another, independent of the witness's honest recollection." *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001) (citing *United States v. Russell*, 532 F.2d 1063, 1068 (6th Cir. 1976)). Accordingly, he has failed to meet his burden of demonstrating the identification procedures were unduly subjective.

---

[5] At the district court in *Perkins*, the witnesses' prior knowledge of the defendant's gold teeth was also given minimal weight because several men in the photo array were pictured with closed mouths. *United States v. Perkins*, 2011 U.S. Dist. LEXIS 65072, at *21–22 (N.D. Ga. Apr. 21, 2011). "Thus, even if the witness may have discerned from [one photo] that the man depicted had something on his teeth, the lineup was not unduly suggestive because the witness, for the most part, could not rule out whether the others depicted within the photographs had gold teeth as well." *Id.* In the photos attached by Tompkins, several men are also pictured with closed mouths. [*See* Record No. 40-1]

### B. Step Two: Was the Identification Reliable?

Because Tompkins has not met his burden at step one, the Court may deny his motion to suppress. However, even if he had met that burden, his motion would be denied at step two. Tompkins raises two issues regarding the reliability: (1) that "the authenticity of the information provided by the informant is tainted by bias"; and (2) that the length of time between the initial observation and identification is uncertain because the government's audio and video evidence contains conflicting time stamps.[6]  [Record No. 40, pp. 3–4]  Again, he has not offered applicable authority to support these arguments.

Considering the totality of the circumstances, Tompkins has not shown that the identifications are unreliable. "The 'primary concern expressed in cases discussing the problems with eyewitness identification relates to a witness observing and subsequently identifying a stranger.'" *Haliym*, 492 F.3d at 706 (citing *Moss v. Hofbauer*, 286 F.3d 851, 862 (6th Cir. 2002). And "any prior acquaintance with another person substantially increases the likelihood of an accurate identification." *Id.*

Here, Witness 1 had met Tompkins multiple times (often under law enforcement surveillance) *and* identified him in February before the allegedly suggestive identification procedure took place in August. While these interactions likely did not last more than a few minutes, Witness 1 expressed a high degree of confidence in identifying Tompkins. The

---

[6] This argument was made in Tompkins's withdrawn motion *in limine*.  [*See* Record No. 17-1.] To the extent that the time and date stamped on videos differs from the dates contained in the Indictment, law enforcement testimony about the equipment used can cure the issue. However, it is unclear how this argument relates to the reliability of an identification. Additionally, the government has not stated what videos (if any) it intends to introduce at trial.

concerns raised by Tompkins regarding Witness 1's identification are outweighed by these factors.

Witness 2's identification is also reliable under the circumstances. While he did not conduct any controlled purchases from Tompkins, Detective Purdue testified that he had experience working with him in other investigations. Additionally, he claimed to have purchased from Tompkins prior to his identification and immediately identified him as "Mr. Good Stuff." The only concern raised by Tompkins that is relevant to Witness 2 is the allegation of bias. However, Detective Purdue also testified that he was unaware of pending charges against Witness 2, and that he was paid the standard $100.00 per controlled purchase. Even if bias existed under these circumstances, it is outweighed by Witness 2's prior meeting of Tompkins and his confidence in identifying him. Accordingly, Tompkins's arguments also fall short at step two of this analysis.

### IV. CONCLUSION

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** that Defendant Tompkins's motion to suppress [Record No. 39] is **DENIED**.

Dated: January 15, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky