UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal Action No. 5: 20-102-DCR |
| ) | |
| V. ) | |
| ) | |
| MARQUIS ANTONIO TOMPKINS, ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

A jury found Defendant Marquis Antonio Tompkins guilty of one count of conspiracy to distribute a mixture or substance containing a detectable amount of fentanyl and heroin, five counts of distribution of a mixture or substance containing a detectable amount of fentanyl and heroin, and one count of possession of a firearm by a convicted felon. [Record No. 83] He has now filed a motion for a new trial under Federal Rule of Criminal Procedure 33(a), arguing that the weight of the evidence does not support a guilty verdict on the firearms charge and that the Court erred in responding to juror questions and allowing testimony from U.S. Probation Officer Carol Martin. [Record Nos. 91; 92] The motion will be denied because Martin has not demonstrated that the interest of justice requires a new trial.

**I.**

A federal grand jury charged Tompkins with eight federal crimes: the seven listed above, and an additional charge of distribution of a mixture or substance containing a

detectable amount of fentanyl and heroin.[1]  [Record No. 29]  He proceeded to trial on all eight counts over four days, beginning May 17, 2021.  During trial, the government presented testimony from investigating officers, lab technicians, and two confidential informants.  Tompkins also presented testimony from a friend, his sister, and an investigating officer.

Several pieces of evidence are relevant to the motion for a new trial.  First, the jury heard testimony from confidential informant Justin Sampley.  Sampley participated in five controlled narcotics purchases with investigating officers, which formed the basis of Counts 2 through 6.  Each interaction was captured on video, and Sampley described his participation and identified Tompkins as the individual distributing the controlled substances in the videos.  The jury also heard from investigating officers who described the procedures used in conducting the controlled purchases and identified Tompkins based on descriptions given by informants, vehicles seen in the videos, and the sound of his voice heard in the videos.

Another confidential informant, Russell Price, confirmed that he and Sampley continued to purchase heroin and fentanyl from Tompkins after Sampley stopped working with investigating officers.  Price testified that Sampley often purchased the controlled substances from Tompkins before selling them to him, but he added that he eventually began purchasing from Tompkins directly.  Sampley and Price disagreed on several aspects of their relationship with each other and Tompkins, but Sampley confirmed that he continued to purchase fentanyl and heroin from Tompkins after his involvement with the investigation came to an end.

---

[1]  The conspiracy in Count 1 was alleged to have commenced on February 20, 2020, and continued until August 23, 2020.  Counts 2 through 6 were related to controlled purchases occurring on February 21, 2020; February 25, 2020; March 2, 2020; March 10, 2020; and March 18, 2020.  Count 7 alleged distribution occurring between July 1, 2020 and August 12, 2020.  Finally, Tompkins was alleged to have illegally possessed a firearm on August 23, 2020 in Count 8.  [Record No. 29]  He was acquitted of the charge in Count 7.  [Record No. 90]

Finally, as relevant here, the jury heard testimony from U.S. Probation Officer Carol Martin, who supervised Tompkins while he was subject to conditions of supervised release. She confirmed several facts relevant to the gun charge. They included: (1) that he had been convicted of a felony punishable by a term of imprisonment exceeding one year; (2) that he was the victim of a shooting at the Fayette Mall; (3) that the vehicle he owned was seized by the Lexington Police Department after he was taken to the hospital following that shooting; (4) that she participated in a search of that vehicle pursuant to Tompkins's conditions of supervised release; and (5) that a loaded, .40-caliber revolver was found under the driver's seat of that vehicle. Prior to trial, Tompkins moved *in limine* to exclude this testimony. [Record No. 60] The Court overruled the motion [Record No. 77], and Tompkins did not seek a limiting jury instruction regarding her testimony.

After hearing the above evidence in addition to other evidence irrelevant to the present motion, the jury found Tomkins guilty on Counts 1 through 6 and Count 8, but acquitted him on Count 7. [Record No. 83] Tompkins timely filed this Rule 33 motion after the guilty verdict. [Record Nos. 91, 92] The government responded [Record No. 98] but Tompkins did not file a reply.

## II.

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Rule 33 does not define "the interest of justice," but the Sixth Circuit has described factors governing motions for a new trial. *See United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (citing *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)). First, the Court must "scrutinize the record and ensure that a 'miscarriage of justice' did not occur." *United States v. Burks*, 974 F.3d 622, 625

- 3 -

(6th Cir. 2020) (quoting *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)).  It could find a miscarriage of justice "where a substantial legal error has occurred," *Munoz*, 605 F.3d at 373 (citations omitted), or "where the evidence preponderates heavily against the verdict." *United States v. Hendricks*, 950 F.3d 348, 354 (6th Cir. 2020) (quoting *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007)).

At the same time, a new trial is appropriate only in "extraordinary circumstances." *See Hughes*, 505 F.3d at 592–93.  A guilty verdict must "exceed the bounds of reasonableness." *Burks*, 974 F.3d at 625.  The Court makes this determination while acting "as a 'thirteenth juror, weighing evidence and making credibility determinations.'" *Hendricks*, 950 F.3d at 354 (quoting *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018)).  But a "verdict is not unreasonable simply because different inferences could be drawn or because other results are more reasonable." *Burks*, 974 F.3d at 625 (cleaned up) (quoting *United States v. Lyimo*, 574 F. App'x 667, 672 (6th Cir. 2014)).

### III.

Tompkins "bears the burden of showing that a new trial ought to be granted." *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991).  He has attempted to do so in several ways.  For Count One, he argues that the Court's responses to juror questions "led to confusion and burden on the jury's deliberation process." [Record No. 92, p. 2–3]  The verdicts on Counts 2 through 6 are attacked on similar grounds. [*Id.* at 3–4]  And the guilty verdict on Count 8 was not supported by any evidence, according to his motion.[2]  [*Id.* at 3]  Finally, he argues that

---

[2]   Tompkins's motion states that "the jury verdict with respect to count one (1) and eight (8) was against the weight of the evidence," but he offers support and argument regarding Count 8 only. [*See* Record No. 91, p. 1]  Since he bears the burden to show a new trial is necessary and has made no effort to do so as to Count 1, the Court assumes that he intends to

- 4 -

the testimony of United State Probation Officer Carol Martin should have been excluded. [Record No. 91, p. 2]  His motion and memorandum in support fall far short of showing that a new trial is appropriate.

Tompkins' motion suffers from a fundamental weakness.  As noted above, motions for a new trial require careful scrutiny of the record to identify whether a miscarriage of justice occurred.  And the defendant bears the burden to state the grounds supporting his motion.  Accordingly, a defendant should provide *specific* citations to the record and include authorities supporting allegations of legal error by the Court.  Instead, Tompkins has filed two documents—which contain no citations to the record—filled with inconsistent and unsupported arguments.[3]  While Tompkins accurately states the law governing Rule 33 motions, as outlined above, there is little else in the filings that is helpful to the resolution of his motion.  Nevertheless, the Court will address his arguments in turn.

**1. Weight of the Evidence**

Tompkins first argues that the guilty verdict on Count 8—which alleged that Tompkins was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1)—was not supported by the evidence.  One element of that crime is that Tompkins, "following his conviction, knowingly possessed a firearm specified in the indictment." *Sixth Circuit Pattern Jury Instruction* 12.01.  Tompkins argues that "there was absolutely no evidence that the defendant had knowledge that the firearm was under the driver seat.  The jury had to base their

---

only challenge the verdict regarding Count 8 on these grounds. However, to the extent that he moves for a new trial on Count 1, because the verdict is against the weight of the evidence, his motion is denied.

[3]   No transcript of the proceedings was requested.

verdict based on speculation that the defendant know [sic] that the firearm was there." [Record No. 91, p. 2] And in his memorandum in support, he merely repeats that the "government offered no evidence as to the knowing element of the charge." [Record No. 92, p. 3]

These assertions are not supported. USPO Martin testified that the firearm was found under the driver's seat of a vehicle owned by Tompkins. And the jury heard testimony that Tompkins had driven the vehicle alone to the Fayette Mall, where the shooting took place, and that no one else had driven the vehicle before it was seized and searched.

After hearing all of the evidence, the jury was instructed that "[c]ircumstantial evidence is simply a chain of circumstances that indirectly proves a fact"; that "a defendant's state of mind can be proved indirectly from the surrounding circumstances"; and that the government could establish constructive possession of a firearm if it proved "that the defendant had the right to exercise physical control over the firearm, and knew that he had this right, and that he intended to exercise physical control over the firearm at some time, either directly or through other persons." [Record No. 83, pp. 9, 17, 27] Evidence that the firearm in question was found under the driver's seat of a vehicle owned by Tompkins and that Tompkins alone had driven the vehicle to the location from which it was seized is sufficient to conclude that the knowledge element of this charge was met.

The only evidence that Tompkins was unaware of a firearm under the driver's seat of a car he owned and was driving was testimony from his friend, Jerry Lee Price.[4] Price claimed the firearm was his and that he left it in Tompkins's car after borrowing it to ride around and drink alcohol. However, after Price was cross examined, and after Tompkins's sister explained

---

[4] Tompkins's filings do not cite this testimony to support his argument.

she "can't see [Tompkins] letting anyone drive his vehicle," the jury voted to convict on this charge. If the jury determined that Price's testimony was not credible, it was entitled to do so. And acting as the "thirteenth juror," *Hendricks*, 950 F.3d at 354 (quoting *Mallory*, 902 F.3d at 596), the Court also determines that Price's testimony was not credible and does not refute the government's evidence that Tompkins had knowledge of the firearm in his vehicle. Accordingly, the guilty verdict on Count 8 is supported by the evidence.

**2. Jury Questions**

Tompkins also challenges the Court's handling of two questions received from the jury after it retired to deliberate. The first question involved the video evidence presented at trial. Before they retired to deliberate, the Court informed the jurors that they could view video evidence in the courtroom if they needed to look at any video evidence again. The Court then received the following note: "We would like to view the video buys for all five transactions." [Record No. 85, p. 1] Tompkins *opposed* allowing the jurors to review the videos. After the government determined that watching the videos would take approximately 3 hours and 26 minutes, the Court asked the jury whether they would like to view the videos in their entirety. Eventually, the Court received a note which stated: "We do not want to review the videos." [Record No. 85, p. 2]

Tompkins now argues that this back-and-forth makes it "obvious the jury was confused" about identifying Tompkins in the videos and shows "the jury was more concerned with getting out of deliberations as opposed to adhering to their request." [Record No. 91, pp. 2–3] Apparently, allowing the jury to decide against viewing the videos "led to confusion and burden on the jury's deliberation process." [Record No. 92, p. 3]

Without any support, Tompkins assumes that the jury decided against watching the videos because it wanted to "get[] out of deliberations." [Record No. 91, p. 3] But he ignores the chance that members merely wanted to confirm their decisions by viewing the videos again but, when presented with the burden of that process, decided against it. Reviewing evidence in open court was an option given to the jury, and members made the choice to rely on what they saw and heard during trial. And Tompkins actually argued, when discussing how to handle this question, that the jury should have to do just that. After scrutinizing the record, the Court does not conclude that it committed any error (and certainly not a substantial legal error) in allowing the jury to decide whether to review video evidence again in open court.

The Court received an additional note stating: "Can we please have clarification for charge #1 as to (a) would Mr. Sampley be considered a co-conspirator for the date Feb 21-March 18 (b) if he is not . . . how would the jury be instructed to determine charge 1." [Record No. 85, p. 2] The attorney for the government, in his closing, had informed the jury that Sampley could not be considered a co-conspirator while working for law enforcement. He did not oppose providing the same information in response to the question. Tompkins argued that the jury instructions were sufficient and that no clarification should be given. Ultimately, the Court told the jury that the answer to the first question was no and that, in answering the second question, the jury would have to consider all evidence and the Court's earlier instructions.[5]

The Court has the duty "to instruct the jury only as to the correct law applicable to the particular case." *United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir. 1988). Neither party

---

[5] Tompkins states that after receiving this question, the Court sent a "note to the jury" which "simply stated 'NO.'" [Record No. p. 1] Scrutiny of the record reveals that this claim is false. All answers to the jury were read in open court and were approved by counsel before being read to the jury. The Court's version of events is accurate.

disputed that the correct answer to the jury's question was no. *See United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984) ("proof of an agreement between a defendant and a government agent or informer will not support a conspiracy conviction.")  Because the jury instructions given, based on Sixth Circuit Pattern Jury Instruction 14.05, did not answer the jury's question, it was appropriate to inform them of the law applicable to the case.

Tompkins argues that answering the question correctly "inserted this court in the deliberation process inappropriately" and "only served to further confuse the jury." [Record No. 92, p. 3]  Tompkins does not argue that this response was legally incorrect or that it contradicted the instruction.  Instead, he simply argues that it should not have been given.  But Tompkins fails to explain what was inappropriate or what "further confuse[d]" the jury.  Had the Court allowed the jury to remain unsure of whether Sampley could be considered a co-conspirator, it could have inappropriately based its guilty verdict in Count 1 on evidence of the controlled purchases.  By accurately answering the jury's question, the Court prevented potential prejudice to the defendant by focusing the deliberations on an accurate statement of the law.  Again, Tompkins has failed to demonstrate error.

### 3. USPO Carol Martin's Testimony

Finally, Tompkins argues that allowing USPO Martin's testimony was error.  He repeats the arguments made when he moved *in limine* to exclude her testimony before trial: that her testimony is prohibited by Federal Rule of Evidence 403.[6]  [Record No. 91, p. 2]  As described above, USPO Martin testified to Tompkins's presence by himself at the Fayette Mall, where his firearm was seized after he was the innocent victim of a shooting.  She also

---

[6] Tompkins includes this argument in his motion but does not address it in his memorandum in support.

described her dealings with him while he was a felon under federal supervision and to his ownership of the vehicle in which she found the firearm during a search. Tompkins argued that evidence that he was under supervision "only served to introduce unnecessary bias and prejudice" and that "the testimony of a shot [sic] at the Fayette Mail [sic] where the Defendant was present was clearly prejudice given the attitude of people in the country about shootings at mails [sic] whether the Defendant was involved or not, which he wasn't." [*Id.*]

However, USPO Martin's testimony was critical to establishing that Tompkins was a convicted felon and that he owned the vehicle where the firearm was found. It also explained the circumstances of the search and that the firearm was found under the driver's seat. Additionally, the government never argued that Tompkins was anything but a victim of the shooting at the Fayette Mall. Rather, evidence of this incident explained why Tompkins was the last person to use his vehicle and why the vehicle was seized and searched. The probative value of USPO Martin's testimony outweighed the danger of unfair prejudice. Fed. R. Evid. 403. Tompkins has not identified any error in the admission of this testimony, much less a "substantial legal error" warranting a new trial.

## IV.

A new trial will not be ordered in this matter. Tompkins has failed to support any of his positions with evidence from the record or relevant authority. Accordingly, it is hereby

**ORDERED** that Defendant Tompkins's motion for a new trial [Record No. 91] is **DENIED**.

- 11 -

Dated: July 23, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky